UNITED STATES BANKRUPTCY COURT
IN THE SOUTHERN DISTRICT OF WEST VIRGINIA

IN RE:

JAMES ALLEN HALL  
JENNIFER DAWN HALL

Case No. 08-20253  
Chapter 13

Debtors.

## MEMORANDUM OPINION OVERRULING, IN PART, OBJECTION TO CONFIRMATION

Pending before the Court is the objection of Ford Motor Credit Company, LLC, formerly Ford Motor Credit Company (hereinafter "Ford") to the Debtors' Chapter 13 plan. As a part of the plan, the Debtors assert that the financing by Ford of negative equity[1] on trade-in vehicle allows them to cramdown Ford's secured claim to the value of their 2007 Ford F150 pickup, despite the fact that the vehicle was purchased within 910 days of their bankruptcy filing. Ford contends that the full amount of its claim must be treated as secured regardless of the actual value of the collateral.

### I. BACKGROUND

On August 20, 2007, the Debtors entered into a contract with Moses Ford, Inc., of St. Albans, WV for the purchase of a 2007 Ford F150 pickup. The Debtors traded in a 2006 Chevrolet K2500 truck. The amount owing on the Debtors' trade-in was $34,599.00. Debtors were given a trade-in allowance of $27,239.18. In the common parlance of the automotive trade, the Debtors were "upside down" on their trade-in to the extent of this difference. Ford agreed to finance this "negative equity" totaling $7,359.82. That sum was fully disclosed on the fact of the contract described as "Net Trade Payoff."

---

[1] When a vehicle's trade-in value is less than the amount of the debt secured by it, the excess debt is typically referred to as "negative equity" and is frequently "rolled into," or made part of, the financing package involving the purchase of a new vehicle.

Approximately 7 months after purchasing the vehicle, the Debtors filed this Chapter 13 proceeding. In numbered paragraph 3 of their plan, the Debtors checked that there were no Class Three claims to be paid, which included motor vehicle claims within 910 days of the filing of the Chapter 13 petition. The plan proposed to pay Creditor's claim as a Class Four claim, listing the total claim at $40,500.00, with a secured value of $26,000. In essence the Debtors sought to bifurcate this claim pursuant to 11 U.S.C. §506 and Ford objected.

## II. DISCUSSION

The Debtors Chapter 13 plan proposes to bifurcate Ford's claim into a secured and unsecured portion. The unsecured portion is to be treated as an unsecured claim in the plan, and paid pro rata with other unsecured creditors. Ford objects to this treatment on the grounds that it holds a claim defined by the hanging paragraph following 11 U.S.C. § 1325(a)(9) (commonly referred to as "910 car claims," or "the hanging paragraph" because it lacks an alphanumeric designation), and, therefore, holds a claim that cannot be bifurcated. While recognizing that Ford may otherwise hold a 910 car claim, the Debtors assert that the financing of negative equity removes Ford's claim from the protection of the hanging paragraph, which only protects "purchase money security interest securing the debt that is the subject of the claim":

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor . . . .

11 U.S.C. § 1325(a).

The hanging paragraph is significant because, without the protection afforded by it, nothing prevents a debtor from using § 506 (which ties the value of a creditor's security interest to the value of the secured collateral) to do exactly what the Debtor proposes: bifurcate Fords's claim against the purchased vehicle into secured and unsecured portions. Before being entitled to the protection of the hanging paragraph, a creditor must satisfy four conditions: (1) the creditor must have a purchase money security interest; (2) securing a debt that was incurred within 910 days before

the filing of the bankruptcy petition; (3) the collateral for the debt must be a motor vehicle; and (4) the motor vehicle must have been acquired from the personal use of the debtor. *General Motors Acceptance Corp. v. Peaslee (In re Peaslee)*, 373 B.R. 252, 257 (W.D.N.Y. 2007). Here, there is essentially no dispute between the parties that elements two through four are present regarding Ford's claim. Therefore, the court must decide only whether (A) Ford holds a purchase money security interest, and (B) how to treat Ford's claim in the Debtor's bankruptcy.

### A.  Purchase Money Security Interest & Negative Equity

The Debtors argue that Ford cannot have a purchase money security interest in a vehicle when a portion of the money loaned was not used for the purchase of the 2007 F150, but was used to payoff a pre-existing loan on the Debtor's trade-in vehicle.

The term "purchase money security interest" is not defined in the Bankruptcy Code. It is defined under State law. In West Virginia, § 46-9-103(a)(1) of the Commercial Code states, "A security interest in goods is a purchase-money security interest to the extent that the goods are purchase-money collateral with respect to that security interest." In turn, "purchase-money collateral" is defined as "goods . . . that secure[] a purchase-money obligation incurred with respect to that collateral." § 46-9-103(a)(1). The term "purchase-money obligation" is defined as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." § 46-9-103(a)(2). Thus, to be entitled to the protection of the hanging paragraph, a creditor must advance funds to the debtor for the purpose of purchasing an automobile.

Courts have reached two different outcomes in determining whether the financing of negative equity destroys a purchase money security interest in a consumer transaction. Some conclude that the financing for negative equity does not destroy the purchase money security interest because the financing of the negative equity is part of the price of the collateral, or value given to enable the debtor to acquire the collateral. *In re Conyers*, 379 B.R. 576, 579 (Bankr. M.D.N.C. 2007) (citing *GMAC v. Peaslee*, 373 B.R. 252 (W.D.N.Y. 2007)); *Graupner v. Nuvell Credit Corp.*, No. 4:07-CV-37CDL, 2007 U.S. Dist. LEXIS 46144 (M.D. Ga. June 26, 2007); *In re Burt*, 378 B.R.

352 (Bankr. D. Utah 2007); *In re Bradlee*, No. 07-30527, 2007 Bankr. LEXIS 3863 (Bankr. W.D. La. Oct. 10, 2007); *In re Wall*, 376 B.R. 769 (Bankr. W.D.N.C. Sept. 17, 2007); *In re Cohrs*, No. 07-21431A13G, 2007 Bankr. LEXIS 2529 (Bankr. E.D. Cal. June 25, 2007); *In re Petrocci*, 370 B.R. 489 (Bankr. N.D.N.Y. 2007).

Others disagree on the basis that the finance of negative equity is not a component of the price of the collateral. *Conyers*, 379 B.R. at 580; *In re Westfall*, 376 B.R. 210 (Bankr. N.D. Ohio 2007); *In re Acaya*, 369 B.R. 564 (Bankr. N.D. Cal. 2007); *In re Price*, 363 B.R. 734 (Bankr. E.D.N.C. 2007)(affirmed in pertinent part by *Wells Fargo Financial North Carolina 1, Inc. v. Price*, 2007 WL 5297071 (E.D.N.C.)); *In re Blakeslee*, 377 B.R. 724 (Bankr. M.D. Fla. 2007).

Importantly, Official Comment 3 to W. Va. Code § 46A-9-103 states that "the 'price' of collateral or the 'value given to enable' [the purchase] includes obligations for expenses incurred in connection with acquiring rights in the collateral . . . ." Such expenses include sales taxes, finance charges, interest, costs of storage in transit, and administrative charges. *Id.* In *Peaslee*, 373 B.R. at 258, the district court included the finance of negative equity in this list. The ruling in *Peaslee* was based, in part, on New York's Motor Vehicle Retail Installment Sales Act, which contained a definition of "cash sale price." By statute, the sale price of a vehicle "include[s] the unpaid balance of any amount financed under an outstanding motor vehicle loan agreement . . . or the unpaid portion of the early termination obligation under an outstanding motor vehicle retail lease agreement." *Id.* at 261.

Unlike New York, West Virginia does not presently have a Motor Vehicle Retail Installment Sales Act. By analogy, the West Virginia Consumer Credit and Protection Act defines the term "cash price" as, "the price at which the goods, services or interest in land are offered for sale by the seller to cash buyers in the ordinary course of business, and may include: (a) applicable sales, use, privilege, and excise and documentary stamp taxes; (b) the cash price of accessories or related services such as delivery, installation, servicing, repairs, alterations and improvements; and (c) amounts actually paid or to be paid by the seller for registration, certificate of title or license fees."

W. Va. Code § 46A-1-102(6). Similarly, with regard to the assessment of a sales tax, the term "sales price" does not include consideration from "the exchange of other vehicles" § 11-15-3c(b).

Apart from statutory definitions of what constitutes the "sales price" for a particular item, a hallmark of a purchase money security interest is that the creditor advance value "to enable the Debtor to acquire rights in or the use of the collateral . . . ." § 46-9-103(a)(2). Logically, the financing of negative equity is not an integral component of the loan agreement to purchase a motor vehicle; it only serves as a convenience to the debtor. *E.g., Conyers*, 379 B.R. at 582 ("In this case, while the loan of additional money was a convenience and an accommodation to the Debtor, the court cannot find that it enabled the Debtor to acquire rights in or the use of the collateral."). No value is added to a vehicle when the creditor also finances the payoff of a trade-in's negative equity; negative equity financing is not necessary to purchase a motor vehicle. *E.g., Price*, 363 B.R. at 741 ("The funds loaned to satisfy the negative equity are not a component of the price of the collateral or the value given to enable the debtor to acquire rights in the collateral, and are significantly and qualitatively different from the fees, freight charges, storage costs, taxes, and similar expenses that are typically part of an automobiles sale."). The bankruptcy court in the Price case based its interpretation upon language under North Carolina law defining "purchase money obligation" that is identical to the language used in the West Virginia statute.

Therefore, the court finds that negative equity financing is not value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used. Negative equity is antecedent debt. If the Creditor had refinanced the Debtors' original car loan, there would be no question that the characterization of the security interest as purchase money would have been lost. It follows that refinancing negative equity by rolling it in to a new purchase money loan does not thereby create a purchase money obligation at least to the extent of the antecedent debt that was refinanced. Ford's financing of negative equity on the Debtors' trade-in is not a purchase money security interest.

**B.     Bifurcation Into 910 and Non-910 Portions**

      Concluding that a creditor does not have a purchase money security interest in a motor vehicle when a creditor also finances negative equity, the court must determine whether that portion of the amount financed that actually went to purchase the vehicle is nonetheless entitled to the protection of the hanging paragraph.

      Two clear lines of authority exist on this issue. The "dual status" rule holds that the non-purchase money security interest component of a claim does not destroy the purchase money security interest of the remainder of the claim. The "transformation" rule holds that the non-purchase money component transforms the entire claim into a non-purchase money security interest. *E.g., In re Weiser*, 381 B.R. 263, 269 (Bankr. W.D. Mo. 2007) ("Courts have essentially adopted two lines of authority regarding treatment of combined purchase money and non-purchase money transactions, known as the 'dual status rule' and the 'transformation rule.' ")

      For non-consumer transactions, § 46-9-103(f)(1) of the West Virginia Commercial Code dictates that a purchase money security interest does not lose its status when the purchase money collateral also secures an obligation that is not a purchase money obligation. No corresponding provision exists for consumer transactions. Rather, by statute, the court is left to determine the proper rules, and the statute admonishes the court that it may not infer that the appropriate rule parallels those used for non-consumer transactions. § 46-9-103(h). In other words, the statute requests that the court make up rules that are appropriate to the facts of the case before it.

      Arguably, the application of the "dual status" rule would prevent debtors from incurring substantial debt secured by a vehicle prior to filing for bankruptcy and, subsequently, cramming down the debt to the value of the collateral. Whereas application of the "transformation" rule would render the hanging paragraph completely ineffective in situations involving the financing of negative equity. Rendering the hanging paragraph ineffective only means that creditors with 910 car claims are treated the same as a creditor that has a car claim that is 911 days old, which is the same treatment that the 910 creditor would have received before the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

Prior to BAPCPA, vehicle financers could be harmed by a debtor who acquired a vehicle in the months leading up to bankruptcy, then filed bankruptcy and crammed the creditor's claim down to the collateral value on the date of filing. Due to the rapid depreciation of motor vehicles the moment they leave the dealer's lot, debtors could often reap a benefit by cramming down the debt, only paying a secured claim equal to the depreciated value of the car. Home mortgages, while a traditionally appreciating asset, are protected from bifurcation and cramdown by 11 U.S.C. §1322(b). In enacting the hanging paragraph, Congress fixed this disparity to ensure that debtors could not load up on vehicle-secured debt pre-petition only to cram it down to the collateral value in bankruptcy. The Court finds that in adopting the dual status rule, the objectives of Congress in passing the hanging paragraph are best served. Accordingly, that is the rule to be applied in this case and in future cases in this district. With respect to payments made on pre-petition debts to which this rule is applied, the Court shall employ a presumption that payments on the two obligations were allocated proportionally.

### III. CONCLUSION

For the reasons set forth above, the Court concludes that with respect to the Debtors' treatment of Ford's claim in their Ch.13 plan, Ford's objection is **OVERRULED** in part, and **SUSTAINED** in part. The debtor is directed to modify the plan such that the negative equity in the trade-in vehicle is characterized as unsecured debt and the actual purchase money amount is treated as a 910 claim, with pre-petition payments made on the loan credited on a proportional basis to each part.

**IT IS SO ORDERED**

Entered: DEC 03 2008

Ronald G. Pearson,
United States Bankruptcy Judge